# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-1293

_____

United States of America

*Plaintiff - Appellee*

v.

Billy Puckett

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: January 15, 2025
Filed: June 11, 2025

_____

Before SMITH, BENTON, and ERICKSON, Circuit Judges.

_____

SMITH, Circuit Judge.

Billy Puckett was convicted of receiving child pornography. Puckett appeals his conviction. He argues that the district court[1] erred in denying his motion to

---

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri.

suppress evidence found on his cell phone and statements that he made to law enforcement. For the reasons given below, we affirm.

## I. *Background*

Missouri State Highway Patrol Trooper James Rorie stopped Puckett's vehicle for alleged state traffic violations. Puckett improperly displayed a disabled placard by hanging it from his rearview mirror, and he was not wearing a seatbelt. Puckett and his dog were the only passengers. Trooper Rorie approached the vehicle, explained the reasons for the stop, and asked Puckett about his trip. Trooper Rorie also asked Puckett whether he had ever been arrested. Puckett revealed that he had an old statutory rape conviction on his record and that he was a registered sex offender. Trooper Rorie then asked Puckett to join him in the patrol vehicle while Trooper Rorie confirmed his license and registration. Puckett agreed.

Once inside the patrol car, Trooper Rorie checked Puckett's criminal history, including information about his sex offender registration. The check revealed that Puckett had not registered any social media accounts on his registration. While the computer check was ongoing, Trooper Rorie and Puckett discussed Puckett's past rape conviction. The computer check showed Puckett's license was valid. Then, in an exchange lasting around 20 seconds, Trooper Rorie asked Puckett if he had anything illegal on him or in his vehicle like drugs or stolen items. Puckett replied that he did not. Trooper Rorie then requested consent to search the vehicle, and Puckett agreed without delay. Puckett then removed his dog from the vehicle so that Trooper Rorie could search it.

During the search, Trooper Rorie saw a cell phone sitting on the driver's seat. Trooper Rorie testified at the suppression hearing that he "grabbed [Puckett's] cell phone . . . and it illuminated." R. Doc. 30, at 8. Trooper Rorie denied having manipulated the cell phone in any way and claimed that it powered on automatically when he picked it up. When the screen illuminated, Trooper Rorie "saw a Facebook application icon and a Snapchat application icon." *Id.* Trooper Rorie then unplugged the cell phone from its charger and approached Puckett with the cell phone in hand.

Trooper Rorie asked Puckett if he had any images or applications that he was not supposed to have and whether he could search the cell phone. Puckett responded, "Well I do have uh . . . some animated images on there." R. Doc. 58-1 (Gov't Ex. 1), at 9:07–14. Trooper Rorie then asked, "You have a problem with me looking through them?" *Id.* at 9:28–30. Puckett did not directly answer this request but went on to explain how when he searched for animated images, they just "pop[ped] up." *Id.* at 9:41–43. Trooper Rorie renewed his request to search the cell phone for any illegal images, and Puckett replied that he did not "know how they classify" child pornography. *Id.* at 9:52–54. Trooper Rorie then asked whether Puckett had Snapchat on his sex offender registration and whether the cell phone in question was Puckett's only cell phone. Puckett confirmed that the device was his only cell phone and admitted to downloading Snapchat "not too long ago." *Id.* at 10:02–03. Trooper Rorie followed up, asking whether Puckett had "any problem with [him] searching th[e] phone" because he "want[ed] to make sure" that the images on Puckett's phone were "legit" and that there was not "any child porn" on the cell phone. *Id.* at 10:23–32. Puckett once again reiterated that he did not "know the imaging" because it "just pops up." *Id.* at 10:34–38. Puckett admitted that he did not "know how to get rid of them" and that he did not "know if they're underage or not." *Id.* at 11:03–05, 11:25–27. Trooper Rorie replied, "Well, I'm not a wizard on these things, I can go through them a little bit; so I might not even find the images you're talking about, but I'd like to take a look at it if you don't mind." *Id.* at 11:37–43. Puckett responded, "I don't mind. Not a problem." *Id.* at 11:44–45.

At that point, Trooper Rorie asked Puckett to put the dog back in the car and return to the patrol vehicle with him so that they could "get a little more comfortable." *Id.* at 11:47–54. Puckett complied. While searching the cell phone, Trooper Rorie continued to converse with Puckett. He asked questions about Puckett's social media profiles, his sex offender registration, and the photographs that Trooper Rorie found on the cell phone. Puckett answered them all. A few minutes later, Trooper Rorie discovered a picture that he believed to be child pornography. Based on that discovery, he asked Puckett to exit the vehicle. He arrested Puckett for possessing child pornography and violating the sex offender

registration laws of Missouri. Trooper Rorie then read Puckett his *Miranda*[2] rights. While standing outside the vehicle, Trooper Rorie continued to ask questions about the pornographic images. They waited by the roadside for one of Puckett's friends to arrive to take care of Puckett's truck and dog.

Trooper Rorie escorted Puckett to the police station. In a subsequent *Miranda* interview, Puckett admitted to possessing child pornography. Trooper Rorie applied for a state search warrant to search Puckett's cell phone and received it. A forensic examination of its contents revealed multiple images and at least one video of child pornography.

A grand jury charged Puckett with receiving child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). Puckett moved to suppress the evidence found on his cell phone as well as the statements that he made before and after he was read his *Miranda* rights. The magistrate judge held a hearing on the motion to suppress and recommended that Puckett's suppression motion be denied. The district court adopted the magistrate judge's report and recommendation. Puckett waived his right to a jury trial and proceeded to a bench trial. The district court subsequently convicted Puckett of receiving child pornography and sentenced him to 210 months' imprisonment.

## II. *Discussion*

On appeal, Puckett argues that the district court erred in denying the motion to suppress on three grounds. First, Puckett argues that Trooper Rorie unlawfully extended the stop when he requested Puckett's consent to search his vehicle. Second, he argues that Trooper Rorie unlawfully searched and seized his cell phone when Trooper Rorie moved it and it illuminated. He asserts this search and seizure rendered Puckett's subsequent consent to search the cell phone involuntary. Finally, Puckett argues that he was subjected to a custodial interrogation without the benefit

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

of *Miranda* warnings. As a result, he asserts that any statements made to law enforcement pre-*Miranda* and post-*Miranda* should have been suppressed.

"When reviewing the denial of a motion to suppress evidence, we review legal conclusions de novo and factual findings for clear error." *United States v. Magallon*, 984 F.3d 1263, 1276 (8th Cir. 2021) (quoting *United States v. Woods*, 747 F.3d 552, 555 (8th Cir. 2014)).

> We [will] affirm a district court's denial of a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made.

*Id.* (internal quotation marks omitted).

## A. *The Scope and Duration of the Stop*

A traffic stop is a seizure within the meaning of the Fourth Amendment, and its "tolerable duration . . . is determined by the seizure's mission—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (cleaned up). Authority for a stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id. Rodriquez* noted that the Supreme Court's Fourth Amendment jurisprudence "tolerated certain unrelated investigations that did not lengthen the roadside detention." *Id.* However, "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Id.* at 354–55 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop." *Id.* at 355. But an officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

Our circuit has two post-*Rodriguez* precedents relevant to this analysis: *United States v. Salkil*, 10 F.4th 897 (8th Cir. 2021), and *United States v. Mathes*, 58 F.4th 990 (8th Cir. 2023). In *Salkil*, an officer initiated a traffic stop based on the defendant's failure to illuminate his rear license plate as required by law. 10 F.4th at 898. The officer ran the defendant's name through a database, uncovering the driver's recent involvement with a seizure of guns and drugs. *Id.* Another officer arrived on the scene, and the original officer decided to issue a warning to the defendant for the traffic infraction. *Id.* For about 37 seconds before issuing the citation, the officer questioned the defendant about his connection to the seizure of guns and drugs and then requested consent to search the vehicle. *Id.* The defendant consented, and the second officer began writing the warning ticket while the original officer searched the vehicle. *Id.* We reasoned that the officer's questioning did not unconstitutionally prolong the detention because "the ticket-writing process consumed more than three minutes" and the defendant "gave consent to search well before the warning ticket would have been completed." *Id.* at 899. Consequently, we held that the "police obtained consent to search within the time reasonably required to complete the mission of the traffic stop." *Id.* Thereafter, "[o]nce police lawfully secured consent to search, any delay occasioned by the search did not constitute an unlawful extension of the seizure." *Id.*

Next, in *Mathes*, we considered whether an officer's request for consent to search a defendant's vehicle after a records check prolonged the stop in violation of the Constitution. 58 F.4th at 993. In *Mathes*, the defendant and two other occupants were stopped for careless driving and improperly displaying a license plate. *Id.* at 992. The officer requested information about the vehicle's occupants from a dispatcher and questioned the occupants about their criminal history while he waited for a response from the dispatcher. *Id.* Once he got the information back from the dispatcher, the officer asked one of the occupants to follow him to the back of the vehicle. *Id.* There, he asked the occupant about their travel plans and then asked for consent to search the vehicle. *Id.* at 992–93. The occupant granted consent. *Id.* at 993. We reasoned that the officer did not impermissibly extend the length of the stop by requesting consent to search the vehicle. *Id.* The request was "only a couple

seconds while [the occupant] was standing at the rear of the vehicle." *Id*. The officer's brief "inquiry did not extend the stop beyond the time that would have been required for [the occupant] to return to the driver's seat." *Id.*

Here, Puckett contends that the traffic stop's mission was complete at the moment the computer system notified Trooper Rorie that Puckett's license was valid. However, at the point Puckett's license was cleared, Trooper Rorie had not issued him a warning or citation related to the traffic infractions, and Puckett had not returned to his vehicle. Thus, at that time, the traffic stop's purpose remained incomplete. In contrast, the officer in *Rodriguez* had run the record checks, returned all the documents to the occupants of the vehicle, written the warning ticket, and finished explaining the warning for the traffic infraction to the occupants of the vehicle. 575 U.S. at 351–52. Subsequently, the officer began an entirely separate criminal investigation by conducting a dog sniff, which was "not fairly characterized as part of the officer's traffic mission." *Id.* at 356. This case more closely resembles *Salkil* and *Mathes*. Those holdings inform our decision here.

Did Trooper Rorie's 20 seconds of questioning and request for consent prolong the stop beyond the time needed to complete the remaining tasks of the traffic stop? We hold that it did not. The brief duration of the inquiry within the reasonable period of the traffic stop's original purpose did not impermissibly prolong it.

This holding does not contradict, as Puckett suggests, the analysis in *Rodriguez*. The Supreme Court in *Rodriguez* held that an officer cannot gain "bonus time" by "completing all traffic-related tasks expeditiously." 575 U.S. at 357. Consequently, when an officer diligently completes his tasks, he cannot pursue an unrelated criminal investigation under the guise that "the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Id.* Trooper Rorie's questioning is lawful not because he did so within the duration of an average stop. Rather, it passes constitutional muster because, in compliance with *Rodriguez*, it was completed within the duration of

-7-

when "tasks tied to the traffic infraction [were]—or reasonably should have been—completed." *Id.* at 354. Here, Trooper Rorie had not completed his traffic-stop related duties when he requested consent to search. The 20 seconds of questioning did not prolong the stop beyond the time that it would have taken Trooper Rorie to issue a written citation or warning and have Puckett return to his vehicle.

### B. *The Search and Seizure of the Cell Phone*

Next, Puckett contends that Trooper Rorie's movement of his cell phone during the search was an unlawful seizure and that his subsequent consent to search the cell phone was not voluntary.

### 1. *Alleged Seizure*

During the consensual search, Trooper Rorie saw a cell phone in the driver's seat. According to his testimony, he picked up the cell phone, and it automatically illuminated. Puckett argues that Trooper Rorie picking up the cell phone and viewing its screen was an unlawful search and seizure outside the scope of his consent to search the vehicle. The government contends that Trooper Rorie was entitled to move objects in the car as part of his general grant to search the vehicle and that the cell phone screen's automatic illumination resulted in information being put into plain view.

"[T]he police do not seize property every time they handle private property." *United States v. Va Lerie*, 424 F.3d 694, 706 (8th Cir. 2005). "A Fourth Amendment seizure of property requires 'some meaningful interference with an individual's possessory interests in that property.'" *United States v. Flores*, 55 F.4th 614, 618 (8th Cir. 2022) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). The "meaningful interference" requirement illustrates that "the Supreme Court inevitably contemplated excluding inconsequential interference with an individual's possessory interests." *Va Lerie*, 424 F.3d at 706 (emphasis omitted). Consequently, "the seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property." *Id.* at 702.

Here, Trooper Rorie was given consent to search Puckett's vehicle for anything illegal. "We measure the scope of consent to search by a standard of objective reasonableness." *United States v. Siwek*, 453 F.3d 1079, 1085 (8th Cir. 2006). The test is "what 'the typical reasonable person [would] have understood by the exchange between the officer and the suspect.'" *Id.* (alteration in original) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

Here, Trooper Rorie questioned Puckett about whether he had anything illegal on his person or inside the vehicle. He followed that up by asking whether Puckett had any "drugs, stolen items, something like that?" R. Doc. 58-1 (Gov't Ex. 1), at 6:13–21. Puckett's consent to search his vehicle authorized a search for drugs, stolen items, or similar objects. *See Siwek*, 453 F.3d at 1085 ("When [the defendant] voluntarily gave a general statement of consent to search his truck, he authorized a search for the items about which [the officer] had questioned him—weapons, stolen property and illegal drugs."). A search for drugs or other stolen items could naturally result in the movement of items during the course of the search, including a cell phone. General consent to search the vehicle would not extend to a search of the cell phone's digital data without probable cause. *See Riley v. California*, 573 U.S. 373, 403 (2014) (holding that the digital data of cell phones contain the "privacies of life" and therefore police must obtain a warrant prior to searching the contents of a phone). Nevertheless, some incidental movement of a cell phone left on the seat of the vehicle is not unreasonable while searching an automobile for illegal items. *See id.* at 387 ("Law enforcement officers remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon."). Importantly, based on Trooper Rorie's testimony, the district court did not clearly err in finding that he did not power on the cell phone, tap the screen, or otherwise manipulate it in a manner to power it on and reveal the digital data of the cell phone. We conclude that Trooper Rorie did not meaningfully interfere with Puckett's possessory interest in the cell phone simply by moving it from the driver's seat because his action was reasonable given Puckett's consent to search his vehicle. The phone was not illegally seized.

## 2. *Alleged Search*

Did Trooper Rorie viewing Puckett's phone's home screen when it automatically illuminated constitute an unreasonable search under the Fourth Amendment? Puckett argues that it did under *Arizona v. Hicks*, 480 U.S. 321 (1987). He contends that Trooper Rorie unconstitutionally searched the cell phone by viewing the home screen because he was "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions" of the cell phone. *Id.* at 325. In *Hicks*, the officers entered an apartment under an exigent-circumstances exception to the warrant requirement. *Id.* at 323. They were looking for a shooter, weapons, and other victims. *Id*. The officer specifically moved the stereo equipment in order to view the serial numbers and determine whether the equipment was stolen. *Id.* at 325. Consequently, the Supreme Court held that the officer's actions "did constitute a search." *Id.* at 324 (internal quotation marks omitted). In contrast, Trooper Rorie was acting within the scope of a broadly defined consensual search for illegal or stolen items. Trooper Rorie did not take any additional action to manipulate or power on the cell phone screen to view its contents. The screen illuminated automatically. *Hicks* is distinguishable and does not render the trooper's actions violative of the Fourth Amendment.

## 3. *Extension of the Stop*

Next, Puckett argues that Trooper Rorie did not acquire reasonable suspicion to extend the stop by viewing the social media notifications visible when his phone illuminated. We disagree. When the cell phone screen illuminated, it displayed Facebook and Snapchat notifications. Trooper Rorie had previously viewed Puckett's sex offender registration and noted that there were no registered social media accounts on his registration. Under Missouri law, sex offenders must register social media accounts within three days of downloading them. *See* Mo. Rev. Stat. §§ 589.407.1(1), 589.414.2(4). Puckett argues that this is insufficient for reasonable suspicion because Trooper Rorie had no confirmation that the three days had passed since Puckett had downloaded those apps. However, our analysis focuses on whether the officer "had reasonable suspicion of criminal activity, not whether [his] reasonable suspicion was confirmed." *United States v. Campbell-Martin*, 17 F.4th

-10-

807, 815 (8th Cir. 2021). Here, Trooper Rorie had reasonable suspicion, based on his experience with sex offender registration requirements and the presence of social media applications on Puckett's cell phone, that Puckett was likely violating Missouri law. This reasonable suspicion justified extending the stop. *See United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) ("If [the officer] had reasonable suspicion to justify expanding the scope of the investigation, however, the extension of the stop would not violate the Fourth Amendment."). Similarly, upon seeing the Facebook and Snapchat icons on Puckett's cell phone screen, Trooper Rorie could seize the phone under the plain view doctrine. *See United States v. Weinbender*, 109 F.3d 1327, 1330 (8th Cir. 1997).

### 4. *Voluntary Consent*

Finally, Puckett argues that his consent to search his cell phone was not voluntary. The district court's determination as to voluntary consent is a factual finding reviewed for clear error. *United States v. Williams*, 97 F.4th 579, 582 (8th Cir. 2024). "The voluntariness of consent is assessed under the totality of the circumstances." *United States v. Thomas*, 97 F.4th 1139, 1142 (8th Cir. 2024). We consider various factors including:

> (1) the defendant's age, (2) the defendant's general intelligence and education, (3) whether the defendant was intoxicated, (4) whether the defendant consented after receiving *Miranda* rights, (5) whether the defendant was aware of his rights and protections because of previous arrests, (6) the length of time the subject was detained, (7) whether the officers acted in a threatening manner, (8) whether law enforcement made any promises or misrepresentations, (9) whether the defendant was in custody or under arrest at the time, (10) whether the consent occurred in public, and (11) whether the defendant was silent as the search was conducted.

*Magallon*, 984 F.3d at 1281.

Puckett asserts that his consent to search was not voluntary because Trooper Rorie's repeated requests for consent were domineering. Repetition alone does not

warrant a finding of involuntariness. *See Thomas*, 97 F.4th at 1143 (finding consent to be voluntary despite officers asking four times if they could search backpack because the individual did not object to search requests and watched the search without objecting). The request must be viewed along with other relevant factors described in *Magallon*. Puckett did not refuse or show unwillingness to consent. He merely avoided Trooper Rorie's requests with conversation about the images that might be on his cell phone. The district court found, and the dashcam footage confirms, that the exchange was not domineering and remained cordial and cooperative throughout the encounter.

Moreover, the other surrounding facts here support the district court's finding of voluntariness. Puckett, 36 years old, was not impaired. He responded and interacted in a way that showed he understood Trooper Rorie's questions. He also had previous experience with the criminal justice system. *See United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990) (holding that previous encounters with the criminal justice system increase defendant's awareness of his legal protections and support a finding of voluntariness). The eight-minute detention was brief, *see United States v. Becker*, 333 F.3d 858, 861 (8th Cir. 2003) (holding that a thirty-minute detention before the defendant consented to the challenged search was "brief"), and the setting was not coercive, *see Chaidez*, 906 F.2d at 382 (holding that the inside of a patrol vehicle on the side of a highway during daylight hours was not a coercive setting). Trooper Rorie did not use threats, physical intimidation, or punishment to obtain consent. Puckett remained cooperative and answered questions about the cell phone's contents. After Puckett gave his consent, he did not object or revoke his consent to search the cell phone at any point. *See Williams*, 97 F.4th at 582 (holding consent to be voluntary when defendant was not intoxicated, officers spoke in a conversational manner, and defendant watched the search without objecting). Considering the totality of the circumstances, the district court did not clearly err in finding that Puckett voluntarily consented to the search of his cell phone.

## C. *The Custodial Nature of the Interrogation*

Puckett argues that the district court erred in denying his motion to suppress the statements that he made during and after the traffic stop. He argues that his Fifth Amendment right against self-incrimination was violated because he was in custody and did not receive *Miranda* warnings prior to being questioned. We review de novo the question of whether the defendant was in custody and review the district court's factual findings for clear error. *See United States v. LeBrun*, 363 F.3d 715, 719 (8th Cir. 2004) (en banc).

### 1. *Pre-*Miranda *Statements*

Puckett argues that he was in custody within the meaning of the Fifth Amendment when Trooper Rorie asked him to sit in the patrol car while Trooper Rorie looked through the cell phone. "Whether a suspect is in custody is an objective inquiry, where we assess both the circumstances surrounding the interrogation and whether a reasonable person would have felt at liberty to end the interrogation and leave." *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (internal quotation marks omitted). Our circuit set forth six non-exclusive factors for determining this question in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990). The magistrate judge examined these six factors, and we will do the same here. The factors include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. Two factors clearly weigh in Puckett's favor. First, Trooper Rorie never informed Puckett that he was free to leave or that he was not under arrest. Second, Puckett was ultimately placed under arrest at the termination of the questioning.

Did Puckett have unrestrained freedom of movement during questioning? "A stop is not custodial if it does not constrain the defendant 'to the degree associated with an arrest.'" *Soderman*, 983 F.3d at 376 (quoting *United States v. Pelayo-Ruelas*, 345 F.3d 589, 593 (8th Cir. 2003)). "Although stopped drivers are detained, they are generally not in custody during the roadside questioning that is permitted during a traffic stop." *Id.* "Even if a reasonable person in [the defendant's] position would not have felt free to leave, this does not amount to custody." *United States v. Johnson*, 954 F.3d 1106, 1111 (8th Cir. 2020).

Here, Puckett's freedom of movement was not constrained to the degree associated with an arrest. After Puckett gave his consent to search his cell phone, Trooper Rorie asked Puckett to put his dog back in his vehicle and join him in the patrol vehicle so they could "be more comfortable." R. Doc. 58-1 (Gov't Ex. 1), at 11:47–54. Puckett joined Trooper Rorie in the front seat, and he was "neither handcuffed nor forced to sit in the back seat." *Soderman*, 983 F.3d at 377. Puckett continued to freely answer Trooper Rorie's questions and engaged in a cooperative conversation about the photos on his cell phone. Thus, Puckett "retained a degree of free movement, as reflected by his frequent gestures, body movement, and statements." *Id.*

Puckett argues that this roadside questioning during a traffic stop was impermissible because it exceeded the scope of the traffic infraction and pertained to a separate criminal investigation. However, Trooper Rorie's prior discovery of evidence of criminality has no bearing on whether Puckett was in custody. *See Johnson*, 954 F.3d at 1111 (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time.")).

The remaining factors all weigh against a finding of custody. The dashcam footage shows that that he voluntarily acquiesced to Trooper Rorie's questions throughout the entire encounter. Next, there is no evidence in the record of Trooper Rorie using any strong-arm or deceptive tactics. The exchange was conversational and free from intimidation. Finally, police presence did not dominate the setting. It was a traffic stop conducted in broad daylight by single officer. *See Berkemer*, 468 U.S. at 438. The questioning only lasted for approximately ten minutes before Puckett was arrested. *See United States v. Laurita*, 821 F.3d 1020, 1027 (8th Cir. 2016) (holding that the fact that an interview lasted only 20 minutes supported the district court's finding that the interview was not police dominated).

Trooper Rorie's questioning of Puckett did not resemble a formal arrest. *See United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (finding that the defendant was not in custody when he was not handcuffed, the tone was conversational, the questions were limited in number, and he had not been told his detention would be anything other than temporary). Considering the totality of the circumstances, a reasonable person would have felt he was at liberty to terminate the interview and ask the officer whether he was free to leave. The district court did not err in finding that Puckett was not in custody during the pre-*Miranda* questioning. Consequently, *Miranda* warnings were not required.

## 2. *Post*-Miranda *Statements*

Puckett's challenge to his post-*Miranda* statements hinges on whether his pre-*Miranda* questioning was in violation of the Fifth Amendment. *See United States v. Ollie*, 442 F.3d 1135, 1140 (8th Cir. 2006) (assuming that an inquiry into the admissibility of post-*Miranda* statements is necessary only when a suspect was in custody under *Miranda* and later given *Miranda* warnings). Puckett does not allege any constitutional violation stemming from his *Mirandized* interview other than its connection to his pre-*Miranda* questioning. Because we conclude that Puckett was not in custody during his pre-*Miranda* questioning, we can conclude that Puckett's post-*Miranda* statements are admissible and should not be suppressed.

### III. *Conclusion*

For the foregoing reasons, we affirm the district court.

_____